UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cr-47-001 |
| | ) | The Honorable Liam O'Grady |
| THOMAS GHERENSE, | ) | |
| | ) | Sentencing Date:  July 17, 2020 |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Gherense, through counsel, has reviewed the Presentence Investigation Report ("PSR") (ECF No. 55) and objects to the PSR's offense level calculation.  Mr. Gherense submits that his total offense level should be 18 to account for his minor role in the conspiracy, which warrants at least a 2-level reduction under USSG § 3B1.2, and his acceptance of responsibility, which warrants a 3-level reduction under USSG §§ 3E1.1(a) & (b).  Mr. Gherense also warrants a departure from the PSR's calculation of his Criminal History Category II, based on a criminal history score of three, to Criminal History Category I based on his single prior offense.  With an offense level of 18, and an adjusted Criminal History Category of I, Mr. Gherense's advisory Guidelines range for Count One, attempt and conspiracy to commit bank fraud, should be 27 to 33 months in prison.  However, Mr. Gherense respectfully submits that even this properly calculated advisory Guidelines sentence would be excessive because the Guidelines range includes a 14-point enhancement based on the intended loss amount.  The loss amount enhancement is both disproportionate to the base offense level of seven and overstates the seriousness of Mr. Gherense's offense because there is little correlation between loss amount and culpability.  Moreover, Mr. Gherense's participation in the fraud was anomalous given his

general good character.  For these reasons, Mr. Gherense respectfully submits that a total sentence of no more than six months incarceration and six months home confinement would be a sufficient but not greater than necessary punishment for his wrongful conduct.

<b>MR. GHERENSE'S BACKGROUND</b>

Thomas Gherense was born to immigrant parents.  His parents left Eritrea, a small African country, in 1981.  They moved to Maryland with the hopes of creating the "American Dream."  His father, Seyoum Gherense, chronicles a desire to get married, buy a house, and have children.  *See* Letter of Seyoum Gherense, attached hereto in Exhibit 1.  And, not long after settling in the United States, the Gherense family began to grow.  Mr. Gherense was born in 1987 in Montgomery County, Maryland.  His parents were loving and doted on Mr. Gherense.



Mr. Gherense describes a childhood in which all of his needs were met.  He grew up in a quiet neighborhood and with loving parents. He was happy and enjoyed his family, friends, school, and sports.



Upon completing high school, Mr. Gherense sought to continue his education.  He enrolled in Salisbury State, but financial troubles prevented him from completing his degree. PSR ¶ 105.  Since then, despite maintaining some form of employment, financial struggles have continued to plague Mr. Gherense, and led to his participation in the instant offense. Nevertheless,   Mr. Gherense's family continues to be his "rock" and support system.  PSR ¶ 96.

3



Mr. Gherense's family continues to support him because notwithstanding his behavior in this case, Mr. Gherense has shown himself to be genuine, thoughtful, and generous. Friends and family uniformly describe Mr. Gherense as caring and note a level of surprise to learn that Mr. Gherense was involved in a bank fraud scheme. Indeed, the letters attached as Exhibit 1 discuss the following instances when Mr. Gherense showed himself to be significantly better than he was in this case:

- While attending college, he helped friends with money for food or rides. Letter of Gary Lyons.

- In one instance, he helped a friend who, while trying to prevent a fight, police accidentally sprayed with mace. He helped get the friend to safety. *Id*.

- Mr. Gherense helps the elderly by shoveling snow, retrieving mail, or removing trashcans from the curb. Letter of Lauren Simpson.

- Mr. Gherense befriended and mentored an unpopular colleague at DARCARS, where the two were employed. He defended the colleague when others mocked and

4

ridiculed him.  Letter of Tewedle Semere.

Mr. Gherense is ashamed that his choices and behavior have led to criminal conduct and will result in punishment.  Not to mention, he is troubled that his behavior has resulted in his friends and family worrying about him.  He blames no one but himself for his actions and is prepared to accept the consequences of his conduct.

## OFFENSE CONDUCT

This case involves a "card cracking" bank fraud conspiracy that operates by depositing counterfeit checks into bank accounts and withdrawing the funds before the fraudulent checks were identified.  *See* PSR ¶¶ 25-29, 35.  The conspiracy at issue here was ongoing from about September 2013 until December 2019.  PSR ¶ 47.

The conspiracy, which consisted of five known individuals, was led by Chea S. Yarl, who has been recommended for an aggravating adjustment for his role in the offense.  PSR ¶ 69.  The conspiracy also includes co-conspirators – Caesar E. Adigwe, Jr., Samuel B. Smith Jr., and Olajide Ogundare-Asubiaro.  PSR ¶¶ 18-21.  They "repeatedly identified names and bank account information that could be used for counterfeit checks and then provided that information to co-conspirators, deposited counterfeit checks, and withdrew funds related to the counterfeit checks."  PSR ¶¶ 34-35, 70.  In addition to the fraudulent transactions concerning Citibank accounts, Yarl, Adigwe, Smith, and Ogundare-Asubiaro engaged in substantial fraudulent transactions concerning M&T Bank, Wells Fargo, and other accounts.  PSR ¶¶ 38-45.  These transactions are associated with hundreds of thousands of dollars in intended losses.  *See* PSR ¶¶ 38-40.

Mr. Gherense joined the conspiracy around 2017, and his first fraudulent transaction was

identified as taking place on November 29, 2017. PSR ¶¶ 56, 60. Mr. Gherense's participation was limited to depositing counterfeit checks and cashing money orders related to the fraudulent deposits. PSR ¶ 70. Mr. Gherense's specific acts included depositing approximately $39,420.33 in counterfeit checks into multiple Citibank accounts from 2017 through 2019. PSR ¶ 56. Mr. Gherense is specifically identified in connection with 18 fraudulent deposits and cashing two money orders. PSR ¶ 56. At least 300 counterfeit checks were used in the scheme in total. PSR ¶ 51. On December 17, 2019, Mr. Gherense was arrested. PSR ¶ 1. Mr. Gherense promptly accepted his responsibility for his acts. PSR ¶¶ 72.

The conspiracy resulted in an actual loss of $217,691.37 and an intended loss of $584,840.67, including losses attributed to a separate scheme that occurred prior to Mr. Gherense's involvement. PSR ¶ 76. Mr.Gherense "received a very small payment" for his participation in the conspiracy. PSR ¶ 72.

## RELEVANT LAW

Courts must impose individualized sentences that are "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, adequately deter criminal conduct, and protect the public. 18 U.S.C. § 3553(a)(2). In determining what sentence is appropriate for a particular defendant, courts must consider, *inter alia*, the nature and circumstances of the offense, the history and characteristics of the defendant, and the advisory range provided by the U.S. Sentencing Guidelines. *Id.* §§ 3553(a)(1), (a)(4).[1] Ultimately, the

---

[1]     The full list of factors for the district court to consider is: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical

Court's punishment must "suit not merely the offense but the individual defendant." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (citation omitted).

The sentencing range recommended by the Guidelines is only one of the considerations in determining what sentence is appropriate.  Indeed, courts are not permitted to "presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (per curiam).  Even when a particular defendant "presents no special mitigating circumstances[,] . . . a sentencing court may nonetheless vary downward from the advisory guideline range" if it determines that the range is greater than necessary to accomplish the goals of § 3553(a)(2).  *Spears v. United States*, 555 U.S. 261, 263 (2009) (per curiam).

## ARGUMENT

### I.    Mr. Gherense Should be Credited for Acceptance of Responsibility

The government does not oppose crediting Mr. Gherense for his acceptance of responsibility in this matter.  Gov. Pos. on Sentencing Factors, ECF No. 57 at 4.   The Guidelines credit a defendant who "clearly demonstrates acceptance of responsibility for his offense" by decreasing his offense level by 2 levels.  U.S.S.G. § 3E1.1(a).  Entering a guilty plea prior to the commencement of trial, combined with truthfully admitting the conduct forming the conviction,

---

care, or other correctional treatment; (3) the kinds of sentences available; (4) the advisory Guidelines range; (5) any pertinent policy statements by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. §§ 3553(a)(1)-(7).

as well as any other relevant conduct is "significant evidence" of acceptance of responsibility. *Id*. Cmt. n. 3.  A defendant is credited an additional point upon motion of the government stating that he has permitted the government to avoid preparing for trial and thereby allocate its resources effectively.  USSG § 3E1.1(b).

Mr. Gherense entered a plea in this matter well in advance of the start of trial.  Indeed, his plea was prior to the government initiating formal charges against him by way of indictment.  At the Plea Agreement hearing, Mr. Gherense admitted his guilt.  Later, he unequivocally admitted the statement of facts was true and that he deposited counterfeit checks given to him.  PSR ¶ 72. He acknowledged that his conduct was wrong and maintained that he was ashamed of his behavior.  *Id.*

The PSR states that Mr. Gherense's pre-plea positive drug tests and new arrest for DUI and related offenses is not indicative of a defendant who has voluntarily withdrawn from criminal conduct.  PSR ¶ 73.  But, Mr. Gherense has tested negative for illegal substances since entering drug treatment on February 22, 2020, and he completed substance abuse counseling on June 1, 2020. PSR ¶ 103.  This change in behavior suggests that he took the Court's warning at the plea hearing regarding continued illicit drug use seriously.  With respect to the DUI allegations, Mr. Gherense immediately reported the arrest to his supervising probation officer. The charges are unresolved and he awaits assignment for a future court date on the allegations. Most importantly, the new allegations are so different from the conduct underlying the offense of conviction that his arrest for DUI does not demonstrate he has not accepted responsibility for fraud.

While this Court does have discretion to find that Mr. Gherense has not accepted

8

responsibility, this Court should not do so here, particularly where the government does not object to granting the reduction.   It is respectfully submitted that Mr. Gherense has sufficiently accepted responsibility for his actions.

II.     <u>Mr. Gherense's Sentence Should Reflect His Minor Role in the Conspiracy.</u>

The Probation Officer did not find, and the government has not argued, that co-conspirators Adigwe, Smith, and Ogundare-Asubiaro played an aggravating role under the Guidelines.  *See* PSR ¶ 70 (co-conspirators "have not received an adjustment for their roles in this conspiracy").  Thus, they should be considered average participants in the conspiracy.  Mr. Gherense played far less of a role in the conspiracy, and was substantially less culpable, than his co-conspirators and his offense level should be decreased accordingly under USSG § 3B1.2.

The determination of whether a defendant was "substantially less culpable than the average participant in the criminal activity," and thus deserving of a mitigating role adjustment under § 3B1.2, is "based on the totality of the circumstances" and "heavily dependent upon the facts of the case.  USSG § 3B1.2, comment. (n.3(A), (C)).  The relative culpability of the "average participant" is measured *only* in comparison to those persons who actually participated in the criminal activity, rather than against "typical" offenders who commit similar crimes. *United States v. Dipadova*, 708 F. App'x 783, 784 (4th Cir. 2017) (citation omitted).  In determining whether to apply a mitigating role adjustment, courts should consider:

1.  the degree to which the defendant understood the scope and structure of the criminal activity;

2.  the degree to which the defendant participated in planning or organizing the criminal activity;

3.  the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

4.  the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

5.  the degree to which the defendant stood to benefit from the criminal activity.

USSG § 3B1.2, comment. (n.3(C)). These factors are not exhaustive and do not all need to be shown to warrant a reduction. Moreover, the Commentary emphasizes that the mere fact that a defendant performed an "essential" or "indispensable" role in the criminal activity is not conclusive in determining whether to apply a mitigating role adjustment and that, such defendant, if otherwise eligible, may receive a mitigating role adjustment. *Id.*

Based on these considerations, Mr. Gherense deserves at least a two-point reduction in his offense level.

First, the PSR does not reference any evidence that Mr. Gherense understood the scope and structure of the criminal activity beyond the specific acts that he undertook.[2] The facts instead suggest that he did not know the scope of the scheme: he was associated with 20 total fraudulent transactions, including check deposits, out of more than 300 total counterfeit checks that were used in the scheme. PSR ¶¶ 51, 56. Moreover, his participation started in 2017, four years after the scheme began. ¶¶ 56, 60.

Second, there is no evidence that Mr. Gherense participated in planning or organizing, that he exercised or influenced decision-making authority, or that he exercised discretion in carrying out his role. Indeed, Mr. Gherense's co-conspirators were responsible for planning and

---

[2] The Probation Officer references only text messages between Mr. Gherense and Mr. Yarl concerning activity separate from the card-cracking scheme, *see* PSR pp. 27-28, and does not explain why those unrelated messages indicate knowledge of the scope of the scheme for which he was charged.

organizing the scheme by recruiting cardholders and identifying names and bank account information that could be used for counterfeit checks and then provided that information to others to carry out the scheme.  PSR ¶¶ 69-70.  The co-conspirators also deposited checks and cashed money orders in connection with the fraudulent transactions.  PSR ¶ 70.  Thus Mr. Gherense's role was to execute the scheme by engaging in fraudulent transactions, whereas his co-conspirators were responsible for both planning and carrying out the scheme.  Finally, no facts suggest that Mr. Gherense exercised any influence on decision-making, nor did he exercise discretion in carrying out his role.  Instead, he "was provided with counterfeit checks and given information about where to deposit those checks," which he did at the direction of his co-conspirators.  PSR ¶ 72.

Finally, Mr. Gherense stood to benefit very little from the fraud.  He reportedly "received a very small payment" for his participation.  PSR ¶ 72.

Although showing Mr. Gherense played a non-essential role is unnecessary for him to receive a reduction under § 3B1.2, the fact that the scheme began four years before he joined it, in addition to the facts above, demonstrates that (1) he was not at all essential to the conspiracy; (2) he did not plan or organize it; and (3) he had no authority or significant responsibilities within it.  While Adigwe, Smith, and Ogundare-Asubiaro could easily go on with planning and carrying out the scheme without Mr. Gherense, he could not possibly have continued the conspiracy without them.  In comparison to these participants, Mr. Gherense can easily be considered non-essential to the scheme, without any sort of planning role or significant responsibilities within it.

Courts have recognized that a minor role adjustment is warranted in fraud cases where

11

defendants have played a greater role, or benefitted more substantially from their participation, than Mr. Gherense did here.  *See, e.g.*, *United States v. Jimenez*, 756 F. Appx. 909 (11th Cir. Nov. 27, 2018) (Two-point minor role adjustment for defendant who cashed checks and opened bank accounts in furtherance of fraud scheme); *United States v. O'Keefe*, 208 F. App'x 126, 129 (3d Cir. Dec. 14, 2006) (Two-point minor role adjustment for defendant who collected $90,000 as part of a fraudulent scheme and "enjoyed an economic interest in the scheme by retaining between five and ten percent of his collections for himself."); *United States v. Yahaya*, No. 18-CR-121, 2019 WL 6839945 (E.D.N.Y. Dec. 12, 2019) (Two-point minor role adjustment was appropriate for defendant who "was not an architect of the scheme" and was paid $2,000 for his involvement, even though "the thousands of dollars in stolen funds he transferred to bank accounts facilitated the continuation of the scheme.").

For these reasons, Mr. Gherense's offense-level calculation should be decreased by at least two levels and his sentence should be significantly lower than the average participants in the fraud.

III.    Assuming the PSR's Offense-Level Calculation Is Correct, It Is Artificially Inflated by the Intended Loss Amount.

Mr. Gherense's PSR calculation includes a 14-level enhancement under USSG § 2B1.1(b)(1)(H) because the offense caused actual or intended losses "in excess of $550,000 but less than $1.5 million."  PSR ¶¶ 6, 76.  Specifically, the Probation Officer calculated an intended loss of $1,022,567.43, and an actual loss of $217,691.37.  PSR ¶¶ 62-65.  However, Mr. Gherense was not a participant in the Virginia General Warrants Fund scheme, which was responsible for $7,691.37 of the actual loss and the $437,726.76 of the intended loss.  *See* PSR

12

¶ 66-68.  The Court should vary downward significantly from the advisory Guidelines
calculation because they grossly inflate Mr. Gherense's culpability in this case.

Generally, and in Mr. Gherense's case in particular, there is a vastly disproportionate weight
assigned to loss amount that does not reflect *the actual harm inflicted* by the offense conduct
involved.  Mr. Gherense's Guidelines range is driven largely by a single enhancement for loss
amount under U.S.S.G. § 2B.1.1.  The loss amount enhancement results in a 14-level increase – a
two-fold increase on top of the base offense level seven.  To illustrate the disproportionality of this
enhancement, consider that there is no other double-digit specific offense enhancement anywhere in
Sections 2A ("Offenses Against the Person") or 2B ("Basic Economic Offenses") of the Guidelines.
Indeed, by generating an offense level of 21 (base level 7 + 14) for Mr. Gherense, before any other
specific offense characteristics or other adjustments are made, the fraud Guidelines result in a level
higher than that which applies to offenses that create more significant dangers to society, including
some violent offenses.

The Commission has recognized that a downward departure may be warranted where
"the offense level determined under this guidelines substantially overstates the seriousness of the
offense."  U.S.S.G. § 2B1.1 Application Note 21(C).  Here, a lower base offense level is
appropriate because the loss amount "is a relatively weak indicator of the moral seriousness of
the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427
(S.D.N.Y. 2004).  In this case, a sentence resulting from the "mechanical correlation between
loss and offense level" would not give adequate weight to other relevant factors, including the
nature of the harm caused and the 3553(a) factors. *See United States v. Ranum*, 353 F. Supp. 2d
984, 990 (E.D. Wis. 2005).  Indeed, the same considerations that warrant a minor role adjustment
– especially Mr. Gherense's limited participation in and minimal benefits from the fraud – also

13

suggest the 14-level enhancement overstates his culpability.[3]

Courts in this district and others have recognized the flaws in this sentencing scheme and have departed downward as a result. For example, in *United States v. Hooper*, Judge Jackson sentenced a defendant to 10 months after making a downward departure from the Guidelines range that was premised on an intended loss of $800,000. *United States v. Hooper*, No. 4:03-cr-00075-RAJ, Dkt. No. 13 (E.D. Va. Nov. 10, 2003). In an unpublished opinion, the Fourth Circuit affirmed the sentence and held "that the district court did not err in departing downward" where the Guidelines' reliance on loss amount "substantially overstated the seriousness of the crime." *United States v. Kalili*, 100 F. App'x 903, 905 (4th Cir. 2004). In that case, as here, the defendant received very little benefit from the fraud and cooperated immediately upon its discovery.

Other courts have recognized the "unusualness" of the sentencing scheme's primary reliance on loss amounts in fraud cases, and have noted that "a sentencing court is entitled to consider" the unusual structure at sentencing. *United States v. Algahaim*, 842 F.3d 796, 797 (2d Cir. 2016) (remanding "to permit the sentencing judge to consider non-Guidelines sentences in view of the significant effect of the loss enhancement in relation to the low base offense level"). In particular, courts should consider a non-Guidelines sentence because "the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss

---

[3] A sentence based on the intended amount of loss in this case overstates the seriousness of the offense for the additional reason that a substantial portion of it is attributable to the intended loss from a separate scheme in which Mr. Gherense was not involved. *See* PSR ¶¶ 65-68; *United States v. Allmendinger*, 706 F.3d 330, 341 (4th Cir. 2013) ("A defendant charged with participating in a conspiracy can be held accountable only for the reasonably foreseeable acts of others that are taken in pursuit of the criminal activity he agreed to join.").

enhancement." *Id.* at 800; *see also United States v. Adelson*, 441 F. Supp. 2d 506, 506 (S.D.N.Y. 2006) (where Guidelines calculations yield an unreasonable result, court should "place greater emphasis on other sentencing factors to derive a sentence that comports with federal law").

As discussed, Mr. Gherense was part of the conspiracy for a short period of time and contributed little to the actual loss of $217,691.37 that the conspiracy caused.  His total fraudulent transactions amounted to approximately $39,420.33.  PSR ¶ 56.  If held responsible only for his own role in the scheme, Mr. Gherense would receive only a 4-level enhancement under § 2B1.1(b)(1)(C) (loss amount between $15,000 and $40,000), yielding an unadjusted offense level of 11 rather than 21.  Even if held responsible for the total actual loss amount, he would receive a 10-level enhancement under § 2B1.1(b)(1)(F) (loss amount between $150,000 and $250,000), yielding an unadjusted offense level of 17.

Mr. Gherense is being held liable for a much greater loss amount than he personally caused.  This severely disproportionate offense-level enhancement is particularly inappropriate for Mr. Gherense, given that, unlike other co-conspirators, he did not help to recruit other participants to advance the conspiracy.  This case serves as a perfect example of why the advisory Guidelines calculation is only one of many factors in determining an appropriate sentence under § 3553(a).  While Mr. Gherense recognizes that fraud conspiracies like this one cause trouble well beyond any money that's stolen, it is still patently unfair to punish him for substantially more than the loss he personally caused.

IV.     Mr. Gherense's Criminal History Calculation Overstates the Seriousness of His Prior Offense.

Mr. Gherense also respectfully requests that this Court depart from the calculated Criminal History Category of II to a Criminal History Category of I given his limited criminal

history.  The Probation Officer calculated Mr. Gherense's Category based on a criminal history

score of three – one point for his only prior offense, and two additional points because the instant

offense was committed during a period of supervised probation for that prior offense.  PSR

¶¶ 89-91.  Mr. Gherense was sentenced on July 5, 2017, to one year of supervised probation for a

state charge of Driving While Impaired by Alcohol.  PSR ¶ 87.  Besides that sentence and a $150

fine he received for driving without a valid license in 2017, Mr. Gherense has had no criminal

history until his recent arrest for driving while impaired.  However, that sole prior offense has

been magnified by two additional points under USSG §4A1.1(d) because the instant offense

overlapped in part with his period of probation, placing him in Criminal History Category II.

Because Mr. Gherense's prior offense is limited to one instance of driving while impaired,

Category II overstates the seriousness of Mr. Gherense's prior conduct and does not accurately

reflect his likelihood of recidivism.

At least one court has reached the same conclusion.  *See United States v. Gonzalez-*

*Rivera*, No. 05 CR 402, 2011 WL 4916395, at *1 n.1 (S.D.N.Y. Oct. 17, 2011).  The

circumstances in that case are parallel to Mr. Gherense's situation.  There, the defendant was

initially determined to have three total criminal history points, but his prior offense was a

conviction for "driving while ability impaired by alcohol" ("DWAI"), comparable to Mr.

Gherense's prior offense.  The defendant received one point for the conviction, and two more

because he was on conditional discharge at the time he committed the instant offense.  The court

reasoned that placing the defendant in Category II "based on his prior DWAI offense

vastly overstated the seriousness of that offense, and therefore departed downward to criminal

16

history category I, pursuant to section 4A1.3." *Id.* Mr. Gherense respectfully requests that this Court make the same departure.

V.      The § 3553(a) Sentencing Factors Support a Shorter Sentence.

Under 18 U.S.C. §§ 3553(a), the Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and avoids unwarranted sentencing disparities.

In this case, Mr. Gherense is being sentenced in the midst of a global health pandemic that has had extraordinary and far-reaching consequences on prison populations and prison conditions.  It is well documented that inmates are particularly vulnerable to COVID-19 because they are in a custodial setting where social distancing simply is not possible.   Inmates sleep in close proximity to one another (sometimes sharing a cell), they share common areas, bathrooms, telephones, and computers.  Unsurprisingly, these unavoidable living conditions have fueled the spread of COVID-19 throughout BOP facilities, with approximately 2,860 inmates currently positive for the virus, approximately 5,137 inmates recovered, and at least 94 inmate deaths.[4] Indeed, the rate of infection in the prison population drastically exceeds the rate of infection in the United States.[5]

Further, the current conditions within federal prisons are far more restrictive and punitive

---

[4] See https://www.bop.gov/coronavirus/ (last visited July 11, 2020).
[5] According to the BOP's coronavirus information page on July 10, 2020 (https://www.bop.gov/coronavirus/), there were a total of 7,987 cases detected in BOP inmates and staff, out of 179,878 total inmates and staff, yielding an infection rate of 4.4%.  As for the United States population of approximately 328 million, there have now been a reported 1.832 million positive cases according to the Johns Hopkins Coronavirus Resource Center (https://coronavirus.jhu.edu/map.html), yielding an infection rate of .95%.

than normal.  Due to COVID-19, the Bureau of Prisons has instituted a lockdown in order to respond to the spread of the disease.  Since March 13, 2020, BOP modified its operations in its facilities to secure inmates to "their assigned cells/quarters to decrease the spread of the virus." Family and friends are prohibited from visiting.  Programming, absent select operations, has ceased and movement throughout the facilities is largely suspended.[6]    Thus, any sentence served now, and for the foreseeable future, will be spent in lockdown conditions similar to solitary confinement.

Thus, in the face of the COVID-19 pandemic, a sentence of even a few months is not only a more severe form of punishment due to the necessary restrictions being employed in jails and prisons, but it is also fraught with significant health risk.   For these reasons, under the present circumstances, a sentence of no more than six months incarceration and six months home confinement is appropriate.[7]

Further, for Mr. Gherense, who has never before spent any time in jail, his arrest and brief detention in this case was a wakeup call.  *See* Letter of Gary Lyons, attached hereto in Exhibit 1.  Any period of detention would be a deterrent.  Moreover, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect.  To the contrary, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry,

---

[6] See https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 12, 2020).
[7] To address concerns of the havoc COVID-19 is currently wreaking on the BOP, the Court could delay Mr. Gherense's reporting to BOP by six months and order house arrest as a condition of bond.  This would serve to have the home confinement portion of the sentence served first.

Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006).  "Three National

Academy of Science panels …. reached that conclusion, as has every major survey of evidence."

*Id.*; *see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm:

Restorative Justice and White Collar Crime, 8 Cardozo J. Confict Resol. 421, 447-48 (2007)

("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

*See also* Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion

that harsh sentences actually have a general and specific deterrent effect on potential white-collar

offenders").

Finally, as a result of the conviction in this case, Mr. Gherense will also experience the

very serious and life-long collateral consequences of being a convicted felon.  This is a profound

mark of shame for Mr. Gherense.  He is prepared to accept this Court's punishment and move

forward with his life and hopes to redeem himself.

## CONCLUSION

For the foregoing reasons, Mr. Gherense respectfully asks the Court to impose a sentence

of no more than six months incarceration and six months home confinement.

> Respectfully submitted,
> THOMAS GHERENSE
> By Counsel
>
> _____/s/_____
> Brooke S. Rupert (Va. Bar No. 79729)
> Office of the Federal Public Defender
> 1650 King Street, Suite 500
> Alexandria, Virginia 22314
> (703) 600-0800 (T)
> (703) 600-0880 (F)
> Brooke_Rupert@fd.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2020, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.  Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

_____/s/_____
Brooke S. Rupert (Va. Bar No. 79729)
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (T)
(703) 600-0880 (F)
Brooke_Rupert@fd.org
